479 A.2d 973

Gerald J. REILLY, a minor, by William J. REILLY and Elizabeth C. Reilly, his parents and natural guardians, and William J. Reilly and Elizabeth C. Reilly, in their own right

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY and Vance Zieganfuss and William M. Baker and Bernice S. Baker.

Appeal of SOUTHEASTERN TRANSPORTATION AUTHORITY and Vance Zieganfuss, Appellants.

Superior Court of Pennsylvania

Argued Dec. 15, 1983.

Filed June 8, 1984.

Petition for Allowance of Appeal Granted Oct. 1, 1984.

422

424

---

David P. Bruton, Philadelphia, for appellants.
Robert C. Daniels, Philadelphia, for appellees.

Before SPAETH, President Judge, and BROSKY and JOHNSON, JJ.

SPAETH, President Judge:

This is an appeal from the entry of judgment on a verdict of $9,815,525 for injuries suffered in an accident involving a bus owned by appellant Southeastern Pennsylvania Transportation Authority (SEPTA) and driven by appellant Vance Zieganfuss. For convenience, we shall generally refer to both appellants as "SEPTA." SEPTA argues: (1) that it is entitled to judgment notwithstanding the verdict because there was insufficient evidence of its negligence: (2) that it is entitled to a new trial because the trial judge should have recused himself; (3) that it is entitled to a new trial because the trial judge erred in his conduct of the *voir dire* and in the charge to the jury; and (4) that at least it is entitled to a new trial limited to the issue of damages. The first argument is without merit. On the second argument, the record is insufficient, for it shows only that recusal may have been required, not that it was required; we therefore remand for further hearing. On the third argument, we decline to review SEPTA's allegations of trial error prior to a resolution of the recusal issue. And on the fourth argument, we hold that there was error in the determination of damages that must be corrected either at a new trial limited to the issue of damages, or if a new trial is ordered after remand, at that trial.

This action arises from an accident that occurred on February 20, 1978. Gerald J. Reilly, then fourteen years old, and two of his friends were passengers in a SEPTA bus. When the bus stopped at the intersection of West Baltimore Avenue and Runnemede Street in Lansdowne, Pennsylvania, Gerald got off. While the bus waited, he walked in front of the bus to cross Baltimore Avenue, and was hit by an automobile passing the bus on the bus driver's side.

Gerald's parents, William J. Reilly and Elizabeth C. Reilly, on Gerald's behalf and in their own right,[1] sued SEPTA, the bus driver, Vance Zieganfuss, and the driver of the automobile that hit Gerald, William M. Baker, and his mother, Bernice S. Baker. The case was tried before the Honorable I. Raymond KREMER and a jury. The jury awarded damages totaling $7,875,000 and apportioned liability as follows: 65% to Baker, 30% to SEPTA, and 5% to Gerald. The trial court reduced the award by $15,000, the amount of wage loss benefits payable under the No-Fault Act. The court further reduced the award by 5% to reflect Gerald's negligence. Finally, the court added delay damages pursuant to Pa.R.C.P. 238, resulting in a molded award of $9,815,525. SEPTA and Zieganfuss filed a motion for judgment n.o.v. or in the alternative for new trial.[2] The court *en banc* dismissed the motion, judgment was entered on the verdict as molded, and SEPTA and Zieganfuss filed this appeal.

–1–

■ SEPTA first argues that there was insufficient evidence of its negligence to support the verdict, and that it is therefore entitled to judgment n.o.v. This argument is without merit. SEPTA admitted that Zieganfuss, the bus driver, was its agent, and although some of the evidence was controverted, when viewed in the light most favorable to Gerald, *Commonwealth v. Blevins*, 453 Pa. 481, 309 A.2d 421 (1973), it was sufficient for the jury to find that the driver was negligent.

On the day of the accident snow along the sides of Baltimore Avenue prevented the driver from pulling the bus up to the curb when stopping to allow passengers to get on or off. N.T. Feb. 22, 1983, at 20–22. When the bus was

1. The trial judge instructed the jury that Gerald's parents were not entitled to recover damages in their own right. They have not appealed.

2. Before submitting the case to the jury, the court directed a verdict against Baker and he has not appealed. Plaintiffs did not proceed against Mrs. Baker at trial and judgment was not entered against her.

stopped to let Gerald off, its left wheels were on or over the center line of the road. *Id.* at 60. The bus driver testified that at the place he stopped the bus there was a path in the snow from the bus to the sidewalk. *Id.* at 21–22. He also testified that when he stopped the bus, a woman was standing in the path waiting to get on, so that in getting off, Gerald jumped onto the snow bank between the bus and the curb. *Id.* at 32.

Gerald was on the bus with two friends, Terry Ringler and William Boyce. Terry testified that Gerald got off the bus before he did, and that while he was still on the bus, he heard the bus driver beep his horn and saw the driver wave Gerald across the street. N.T. Feb. 11, 1983, at 519. Gerald started to cross the street, but just after he had passed the front of the bus he was hit by an automobile passing the bus on the bus driver's side. He was seriously and permanently injured. William testified that he heard the bus driver beep his horn before Gerald was hit. *Id.* at 574, 596. The bus driver testified that he did not blow his horn, and that although he may have pointed to the fare box, he did not make a hand signal to Gerald. N.T. Feb. 22, 1983, at 35, 115, 116. He further testified that he knew he was holding up traffic; that there were at least ten automobiles behind him; and that in such a situation, automobiles tended to pass, illegally, on the left side of the bus. *Id.* at 27, 71. He further testified that when he stopped, he put on his right turn signal but not his flashers, *id.* at 31; that he knew the bus was on or over the center line, *id.* at 60; and that he did not look in his rearview mirror to check the traffic while he was stopped and before Gerald was hit, *id.* at 77.

From this evidence the jury was entitled to find that while Gerald was on the snow bank, the bus driver beeped his horn and waved Gerald across the street in front of the bus, and that the driver took these actions without first checking his rearview mirror or putting on his flashers, and knowing that traffic was backed up behind him and that in such a situation, automobiles tended to pass the bus on the

left. From these findings the jury was entitled to proceed to the conclusion that the driver was negligent.

–2–

(a)

SEPTA's first argument for a new trial is that the trial judge should have recused himself. SEPTA assigns four reasons in support of this argument. The record is sufficient for us to determine the merit of the first two reasons, but not of the last two. We must therefore remand so that a judge other than the trial judge may receive further evidence and determine on the basis of a complete record whether the trial judge should have recused himself.

(i)

■ SEPTA argues that the trial judge should have recused himself because he was hostile to SEPTA's trial counsel, Stuart Schwartz. In support of this argument SEPTA cites statements the judge made to Mr. Schwartz during oral argument in another case, before this case was tried. We find that SEPTA has waived this argument. Mr. Schwartz first raised the judge's alleged hostility to him as a basis for recusal by oral motion made at a pre-trial conference on June 23, 1982. The judge denied any hostility but nevertheless granted SEPTA leave to file a written motion for recusal within five days. SEPTA, however, filed no such motion until the morning of trial, February 8, 1983. Not only has SEPTA offered no excuse for this delay but the record shows that it has no excuse, for its counsel had knowledge of the facts forming the basis of the motion when the motion was first made orally, on June 23, 1982.

■ In any event, SEPTA's argument is without merit. The trial judge assured Mr. Schwartz that although he had disagreed with him in the prior case, he bore him no antipathy, N.T. Feb. 8, 1983, at 27, and we find nothing in the judge's statements in the prior case that persuades us that we should reject this assurance. In this regard, we note that SEPTA's argument that the judge was so hostile as to require recusal is "confined to the court's participation

in the former trial," *Commonwealth v. Boyle,* 498 Pa. 486, 491 n. 6, 447 A.2d 250, 252 n. 6 (1982); it is not based on anything that occurred apart from that trial. As will appear, SEPTA's remaining arguments for recusal are not so confined.

(ii)

■ SEPTA also argues that the trial judge should have recused himself because counsel for Gerald and his parents, Robert Daniels, had represented the judge in a class action. According to SEPTA, Mr. Daniels's past representation of the judge required the judge to recuse himself because, in the words of Canon 3 C of the Code of Judicial Conduct, it created a situation "in which [the judge's] impartiality might reasonably be questioned." We are not persuaded by this argument.

We acknowledge that perhaps sometimes an attorney's past representation of a judge will be enough by itself to create such an appearance of impropriety that the judge may not preside in later cases in which that attorney appears. *Cf. Bole v. Nationwide Insurance Co.,* 475 Pa. 187, 379 A.2d 1346 (1977) (when contract calls for disinterested arbitrators, past representation of one of parties by designated arbitrator disqualifies that arbitrator). In appraising the significance of past representation, however, the fact that it *is* past must be recognized. Thus, the appearance arising from the fact of past representation will ordinarily be much less disturbing than the appearance arising from concurrent representation. For it is more likely to appear to a reasonable person that the judge's conduct of the trial might not be impartial when one of the attorneys is, even as the trial is being held, representing the judge. *See Potashnick v. Port City Construction Co.,* 609 F.2d 1101 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980) (plaintiff's attorney was representing judge, albeit nominally, in several pending unrelated matters); *Texaco v. Chandler,* 354 F.2d 655 (10th Cir.1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1066, 15 L.Ed.2d 853

(1966) (one of plaintiff's attorneys was at time of trial defending judge in another action brought against judge personally); *DeCamp v. Good Samaritan Hospital*, 66 A.D.2d 766, 410 N.Y.S.2d 671, (1978) (attorney for defendant revealed that he or his firm was also representing member of malpractice panel in unrelated malpractice action); ABA Committee on Ethics and Professional Responsibility Informal Opinion No. 1477 (August 12, 1981) (judge must recuse himself in cases in which a litigant is represented by an attorney also representing judge in a personal matter or matter pertaining to his official conduct); ABA Committee on Ethics and Professional Responsibility Informal Opinion No. 1331 (June 25, 1975) (advisable for firm representing judge in action not to appear before that judge).

■ Here, Mr. Daniels's past representation of the trial judge was not in a matter personal to the judge; it was in a class action seeking increased compensation for all Pennsylvania trial judges. *Kremer v. Barbieri*, 48 Pa.Comw. 557, 411 A.2d 558, *aff'd*, 490 Pa. 444, 417 A.2d 121 (1980). The fact that the trial judge was the named plaintiff in the class action was not significant, for as members of the class all of the trial judges stood to gain or lose by the decision. Were we to hold that the trial judge should have recused himself only because as a member of the class he had been represented by Mr. Daniels, it would follow that no trial judge could preside in any case in which Mr. Daniels appeared. In such a situation, the so-called "rule of necessity" becomes operable. *See, e.g., United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980) (although 28 U.S.C. § 455 on its face requires recusal of all federal judges due to personal interest in outcome of suit challenging laws designed to reduce cost of living increases for federal judges, under rule of necessity Justices may hear and decide the case); *Duplantier v. United States*, 606 F.2d 654 (5th Cir.1979), *cert. denied*, 449 U.S. 1076, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981) (since all federal judges have an interest in case challenging constitutionality of act requiring finan-

cial disclosure by judges, trial judge did not err in refusing to disqualify himself); *Philadelphia v. Fox*, 64 Pa. 169, 185 (1870) ("The true rule unquestionably is that wherever it becomes necessary for a judge to sit even where he has an interest—where no provision is made for calling another in, or where no one else can take his place—it is his duty to hear and decide, however disagreeable it may be."); ABA Committee on Ethics and Professional Responsibility Informal Opinion No. 1477, *supra* (under rule of necessity, if a party's attorney also represents court or judicial system in matter pertaining to judicial salaries, disqualification may not be required).

(iii)

SEPTA also argues that the trial judge should have recused himself because his son-in-law, Robert Mongeluzzi, is affiliated with the firm of Daniels, Golden and Saltz, P.C., which represented Gerald and his parents.

Canon 3 C of the Code of Judicial Conduct, adopted by our Supreme Court, effective January 1, 1974, 455 Pa. at xxxix (1973), provides in part:

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, *including but not limited to* instances where: ...

(d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person: ...

(ii) is acting as a lawyer in the proceeding;

(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding ....

(Emphasis added.)

■■■ Counsel for Gerald argues that under Canon 3 C, recusal is required only if the trial judge *subjectively* determines that he is unable to be impartial. This view of the law is plainly and fundamentally mistaken. To be sure, if the judge does subjectively feel unable to be impartial, he must recuse himself. But Canon 3 C sets forth an *objective*

standard: no matter how the judge himself feels, if "his impartiality might *reasonably be questioned,*" recusal is required. The question, therefore, is not how the judge appraises the situation but how a detached observer—the common law's "reasonable man"—would appraise it. If a reasonable observer would conclude that the situation is such that the judge's "impartiality might reasonably be questioned," the judge should recuse himself. The party claiming that the judge should have recused himself is therefore under no obligation to show any actual prejudice—to show, that is, that subjectively, or in fact, the judge was not impartial; it is enough to show that a reasonable observer might have questioned the judge's impartiality. Thus our Supreme Court has stated:

A jurist's impartiality is called into question whenever he has doubts as to his ability to preside objectively and fairly in the proceeding *or* where there exists [*sic*] factors or circumstances that may reasonably [bring into] question the jurist's impartiality in the matter.

*Commonwealth v. Boyle,* 498 Pa. at 490 n. 4, 447 A.2d at 252 n. 4 (emphasis added).

*See also Commonwealth ex rel. Allen v. Rundle,* 410 Pa. 599, 189 A.2d 261 (1963) (denial of habeas corpus petition reversed and record remanded for disposition before different judge despite record that shows no actual prejudice); *Commonwealth ex rel. Armor v. Armor,* 263 Pa.Super. 353, 398 A.2d 173 (1978) (remand for assignment of out-of-county judge or grant of change of venue despite review of record showing no actual bias; court evenly divided on whether there was an appearance of impropriety.[3]

3. To the extent that cases decided before the Supreme Court's adoption of the Judicial Code require a showing of actual prejudice, they are no longer authoritative. *See, e.g., Ciaffoni v. Ford,* 211 Pa.Super. 472, 237 A.2d 250 (1968) (*dictum* that there was no reason to set aside verdict on motion for new trial—record was entirely free from suggestion of prejudice or impropriety); *Askounes' Liquor License Case,* 144 Pa.Super. 293, 19 A.2d 846 (1941) (no abuse of discretion in denying motion for new trial—counsel explicitly stated that trial judge was entirely fair and disinterested).

■ · As will have been observed, Canon 3 C does not attempt a comprehensive recitation of instances in which the judge's impartiality might reasonably be questioned. Instead, it recites only certain instances, stating that the judge should recuse himself "in a proceeding . . . including but not limited to" such instances. Two of the instances thus specified as requiring recusal concern "a person within the third degree of relationship to [the judge] or the spouse of such a person." These are the instances that we must examine here, for as the trial judge's son-in-law, Mr. Mongeluzzi was "the spouse of such a person," *i.e.*, of a person "within the third degree of relationship." More specifically, he was the spouse of a person within the *first* degree of relationship to the judge.[4]

■ One instance specified by Canon 3 C as requiring recusal is where the spouse of a person within the third degree of relationship to the trial judge "is acting as a lawyer in the proceeding." Canon 3 C(1)(d)(ii). However, nothing in the record suggests, and SEPTA does not claim, *see* its brief at 16, that Mr. Mongeluzzi was acting as a lawyer in this case.

A second instance specified by Canon 3 C as requiring recusal is where the spouse of a person within the third degree of relationship to the trial judge "is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." Canon 3 C(1)(d)(iii). SEPTA argues that this provision required the trial judge to recuse himself. SEPTA disclaims any knowledge of Mr. Mongeluzzi's compensation or of the exact nature of his affiliation with or prospects at the law firm of Daniels, Golden and Saltz, P.C. It asserts, however, that a verdict of the size returned in this case—$9,815,525—will likely

---

4. Canon 3 C(3)(a) provides: "the degree of relationship is calculated according to the civil law system." Under the civil law the degree of relationship is calculated by counting up from one person in question to the common ancestor and then back down to the other person in question, thereby encompassing only blood relationships. *McDowell v. Addams,* 45 Pa. 430 (1863). Thus, a daughter is within the first degree of relationship to her father.

buttress the reputation of the firm, to Mr. Mongeluzzi's benefit. We acknowledge that this argument has some force. We have concluded, however, that it goes too far, which is to say, that before we can decide whether recusal was required by Canon 3 C(i)(d)(iii), the record must contain more facts than it does now.

The comment to Canon 3 C states:

The fact that a lawyer in a proceeding is affiliated with a law firm with which a lawyer-relative of the judge is affiliated does not *of itself* disqualify the judge. *Under appropriate circumstances,* the fact that 'his impartiality might reasonably be questioned' under canon 3 C(1), or that the lawyer-relative is known by the judge to have an interest in the law firm that could be 'substantially affected by the outcome of the proceeding' under Canon 3 C(1)(d)(iii) may require disqualification.

(Emphasis added.)

In considering when a lawyer-relative's affiliation with a firm will constitute "appropriate circumstances ... requir[ing] disqualification," it is useful to examine federal cases, for the federal statute governing disqualification of federal judges, 28 U.S.C. § 455, was patterned after the Code of Judicial Conduct. The federal statute provides in relevant part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances: ...

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such person: ...

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding ....

Several federal courts have dealt with the problem of whether under the federal statute a judge is disqualified from proceeding in a case because a relative within the third degree of relationship to the judge is affiliated with a firm representing a party in the case. Generally stated, the outcome has depended on the particular facts of each case.

In *SCA Services, Inc. v. Morgan*, 557 F.2d 110 (7th Cir.1977), the court held that recusal was required under 28 U.S.C. § 455(b)(5)(iii). The judge's brother was a senior partner in a relatively small firm that was representing the defendant. The court noted that the case involved millions of dollars, and that as a partner the brother had a substantial interest in the firm's reputation and good will. In *Potashnick v. Port City Construction Co., supra,* the court stated that whenever a partner in a firm representing a party is related to a judge within the third degree, recusal is required under § 455(b)(5)(iii). The court cited Advisory Committee on Judicial Activities Advisory Opinion No. 58 (August 9, 1978), in which the Committee stated that under the Code "[a] judge is disqualified and should recuse if a relative within the third degree of relationship to the judge or his spouse ... is a partner in a law firm appearing in the case ...."

In *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456 (5th Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978), the court held that recusal was not required. The judge's son was an associate in the firm representing a party. The court stated that the son's salary interest as an associate was too remote to require recusal under § 455(b)(5)(iii). In *Miller Industries, Inc. v. Caterpillar Tractor Co.*, 516 F.Supp. 84 (S.D.Ala.1980), the court also held that recusal was not required under § 455(b)(5)(iii). The judge's father was of counsel to the firm that represented the plaintiffs. The firm had 33 members and the judge's father had no financial interest that could be substantially affected by the outcome of the case. He was paid a fixed salary of $12,000 and was provided secretarial services, an office, a parking space, and club dues. The

court also held that given his retired status, the father had no substantial "other interest" in the firm, such as an interest in the firm's reputation.

In Advisory Committee Opinion on Judicial Activities No. 58, the Committee stated that under the Code "[a] judge is disqualified and should recuse if a relative within the third degree of relationship to the judge or his spouse ... will profit or lose from the judge's action in the case either financially or otherwise, for example, the reputation of the firm would be significantly affected by the litigation." The Committee also stated that "[f]requently the relative's compensation from the law firm is in no manner dependent upon the result of the particular case before the judge. If compensation is affected, then whether the judge's relative is designated a partner, or associate, or by some other term, we conclude the judge should recuse."

Here, as we have indicated, SEPTA may be correct in its claim that the large verdict returned in this case will likely buttress the reputation of the Daniels firm to Mr. Mongeluzzi's benefit. We are persuaded by the federal cases, however, that recognition of this possibility is not enough by itself to warrant a decision that the trial judge was required to recuse himself under Canon 3 C(1)(d)(iii). Rather, we believe we must know more: Exactly what was Mr. Mongeluzzi's "interest" in the Daniels firm? Could that interest be "affected by the outcome of [this case]," and if so, could it be "substantially affected"? And what was "known by the judge" regarding Mr. Mongeluzzi's interest? Since the record does not now contain enough facts to permit an answer to these questions, we must remand for a hearing so that the record may be made complete.

(iv)

■ SEPTA's final argument with respect to recusal is that the trial judge was required to recuse himself because his step-nephew, Richard Haaz, who is also affiliated with the Daniels firm, is a former law clerk of the judge, acted as a lawyer in this case, and concurrently represented the judge in another unrelated case. In this same regard,

SEPTA alleges that before his elevation to the bench, the trial judge represented Mr. Haaz's mother.

In considering the several aspects of SEPTA's argument, it is convenient to start with the fact that Mr. Haaz acted as a lawyer in this case. (The parties are in dispute as to the extent of Mr. Haaz's participation, and the record on this issue is not complete, but for purposes of our present discussion it is not important how extensive Mr. Haaz's participation was.) It will be recalled from our preceding discussion that if a person within the third degree of relationship to the trial judge "is acting as a lawyer in the proceeding," recusal is required under Canon 3 C(1)(d)(ii). SEPTA claims that Mr. Haaz is such a person. This argument is without merit, for a step-nephew is not within the third degree of relationship.

Canon 3 C(3)(a) provides that the degree of relationship is to be calculated according to the civil law system, which traditionally recognizes only blood relationships. *See supra* n. 4. Nevertheless, SEPTA argues that Canon 3 C(1)(d) should be interpreted to include relationships by affinity; that affinity encompasses relationships by marriage; and that as the son of the judge's brother's wife, Mr. Haaz and the judge are related within the third degree by marriage. This argument errs in two respects: First, as defined at common law, "affinity" does not exist between a step-nephew and his step-uncle. Second, Canon 3 C(1)(d) of the Code of Judicial Conduct expressly provides its own rule of affinity, and this rule does not encompass a step-nephew.

As defined at common-law, "affinity" is the relationship that arises by marriage between the wife and blood relatives of the husband and between the husband and blood relatives of the wife. *See generally* 2A C.J.S. at 512–15 (and cases cited therein). *See also Kirby v. State,* 89 Ala. 63, 8 So. 110 (1889); *State ex rel. Perez v. Wall,* 41 Fla. 463, 26 So. 1020 (1899); *McLendon v. State,* 187 Miss. 247, 191 So. 821 (1939); *Wilson v. Greenacres Country Club,* 41 N.J.Super. 530, 125 A.2d 539 (1956); *Johnson v. State,* 169 Tex.Crim. 1461, 332 S.W.2d 321 (1960). Under the common

law definition, therefore, the judge is related by affinity to the blood relatives of his spouse and to the spouses of his blood relatives. According to the old adage:

The groom and bride each come within,
The circle of each other's kin,
But kin and kin are still no more
Related than they were before.

*Cortez v. State*, 144 Tex.Crim. 116, 120, 161 S.W.2d 495, 497 (1942).

In other words, at common law the blood relatives of one spouse are not related by affinity to the blood relatives of the other spouse. Thus, at common law the trial judge, who is a blood relative of his brother, would not be related by affinity to Mr. Haaz, who is a blood relative of the brother's wife. *See, e.g., Kirby v. State, supra* (juror, being a cousin of the step-father of the deceased, was related by affinity to mother of deceased, but bore no relationship to deceased himself); *McLendon v. State, supra* (judge related by affinity to his aunt's husband, but not related to victim who was the husband's daughter and aunt's step-daughter).

SEPTA's argument in effect is that we should read an expanded common law definition into the Judicial Code so as more fully to effectuate the Code's purpose of avoiding even the appearance of impropriety. But this is where the second error in SEPTA's reasoning becomes relevant. The Code has its own expanded definition of affinity. Although the Code does not use the term "affinity," the relationships expressly provided for in Canon 3 C(1)(d) encompass and go beyond those encompassed in the common law definition of affinity. As just stated, at common law a judge would be related by affinity to the spouses of his blood relatives and to the blood relatives of his spouse. ("The groom and bride each come within the circle of each other's kin.") Under the operation of Canon 3 C(1)(d), the judge is considered to be related not only to these persons, but also to the spouses of the blood relatives of his spouse. ("A person within the third degree of relationship to [his spouse], or the spouse of

such a person.") Since the Code has already expanded the common law definition of affinity (although without using the term "affinity"), we conclude that we should not further expand it on the pretext that doing so will more fully effectuate the Code.

According to the civil law system, which Canon 3 C(3)(a) makes applicable, and which encompasses only blood relationships, *see supra* n. 4, the trial judge is related in the second degree to his brother. Canon 3 C(1)(d) further operates to encompass his brother's wife. But Canon 3 C(1)(d) does not encompass blood relatives of his brother's wife, such as her son, Mr. Haaz. Therefore, assuming, as SEPTA argues, that Mr. Haaz was acting as a lawyer in the proceedings, the trial judge was not required because of that fact to recuse himself under Canon 3 C(1)(d)(ii).

■■ Neither was the trial judge required to recuse himself because Mr. Haaz is a former law clerk of the judge. The record does not suggest, nor does SEPTA claim, that Mr. Haaz was in any way involved in this case while serving as the judge's law clerk. *Cf.* Pa.Code Prof.Resp. DR 9–101(B) (a lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee); *Fredonia Broadcasting Corp., Inc. v. RCA Corp.,* 569 F.2d 251 (5th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978) (error for judge not to recuse himself when former law clerk had been on judge's staff during first trial and participated as attorney in proceedings preceding retrial); *Miller Industries, Inc. v. Caterpillar Tractor Co., supra* (error for judge not to recuse himself when law clerk worked on case after having accepted offer of employment from firm representing one of parties). In contrast to some other jurisdictions, our Supreme Court has not adopted a *per se* rule prohibiting a former law clerk from practicing for a specified period before the judge for whom he clerked. *See e.g.,* U.S. Supreme Court Rule 7 (law clerk to U.S. Supreme Court Justice may not practice before Court for two years from date of separation). *Cf.* 42 Pa.C.S. § 2502 (prohibiting

common pleas court law clerk from practicing before own judge during employment); Pa.R.A.P. 3121 (prohibiting appellate court law clerk from practicing before that appellate court during employment). In addition, although the Ethics Act, 65 P.S. § 403(e), would appear to prohibit such practice for one year following the termination of the employment, the constitutionality of the Act as applied to law clerks is certainly in doubt. *Public Utility Commission Bar Association v. Thornburgh,* 498 Pa. 589, 450 A.2d 613 (1982) (Ethics Act provision that no former public employee could represent a person before the governmental body with which he had been associated for one year after he left such body, held unconstitutional as to lawyers who had served as assistant counsel to the PUC); *Wajert v. State Ethics Commission,* 491 Pa. 255, 420 A.2d 439 (1980) (same provision held unconstitutional as applied to former judge— Court refrains from addressing constitutionality as applied to law clerks but Court's reasoning strongly suggests provision is unconstitutional as applied to any attorney seeking to practice in Pennsylvania courts). Given the Supreme Court's failure to adopt a *per se* rule, we decline to do so through interpretation of the Judicial Code. *Cf. Commonwealth v. Krasner,* 285 Pa.Super. 389, 427 A.2d 1169 (1981) (mere fact of former association with attorney who three years later appears before judge insufficient to require recusal). *See also Smith v. Pepsico, Inc.,* 434 F.Supp. 524 (S.D.Fla.1977) (recusal not required under 28 U.S.C. § 455(a) when plaintiff's attorney was law clerk for judge for period of two years ending more than two years ago).

■■■ Neither was the trial judge required to recuse himself because Mr. Haaz was concurrently representing the judge in another unrelated action. The action in question was *Kremer v. State Ethics Commission,* 56 Pa.Comw. 160, 424 A.2d 968 (1981), *aff'd,* 503 Pa. 358, 469 A.2d 593 (1983), a class action on behalf of all Pennsylvania judges. This action sought injunctive and declaratory relief to prevent the State Ethics Commission from enforcing financial disclosure provisions of the Ethics Act. Given the rule of

necessity, discussed *supra*, the fact that Mr. Haaz was concurrently representing the judge as one member of the class did not require the judge to recuse himself.

■ Finally, we note SEPTA's argument that before his elevation to the bench, the trial judge represented Mr. Haaz's mother. We cannot appraise this argument, for the record does not disclose the nature of the representation. It does not appear, however, nor does SEPTA claim, that the representation was such as by itself to require recusal, as for example is the case where a lawyer within the third degree of relationship to the judge acts as a lawyer in the proceeding.

■ We therefore conclude that no single one of the several argued aspects of the trial judge's relationship to Mr. Haaz required recusal. The question remains, however, whether in combination the several aspects required recusal. Counsel for Gerald argues that this can not be so; in his view, it is equivalent to saying that the sum of several zeros can be greater than zero. This argument is without merit. There are many situations in the law where facts insignificant separately are in combination compelling. The situation regarding Mr. Haaz is similar to that regarding Mr. Mongeluzzi. As the record does not now contain enough facts regarding Mr. Mongeluzzi's interest in the Daniels firm and the trial judge's knowledge of that interest, so it does not now contain enough facts to permit determination of whether the relationship between the trial judge and Mr. Haaz was so intimate and of such duration, and Mr. Haaz's participation as a lawyer in the case so extensive, as to create a situation in which "[the judge's] impartiality might reasonably be questioned." Canon 3 C(1). We must therefore remand for hearing so that the record may be made complete.

(b)

Counsel for Gerald, and also, the trial judge himself, resist any remand, and it is now in order to consider their several arguments. To some extent their arguments over-

lap the arguments offered by Judge JOHNSON in his dissenting opinion. However, we shall consider Judge JOHNSON's arguments separately.

(i)

Counsel for Gerald argues that even if the trial judge should have recused himself, SEPTA has waived any objection to the judge not recusing himself in that it failed to make a timely motion alleging the grounds for recusal. SEPTA denies any waiver, alleging that it raised each ground for recusal as soon as it had knowledge of the pertinent facts. At this point we may note at what times in the proceedings SEPTA did ask the trial judge to recuse himself.

As has been mentioned, the first time was at a pre-trial conference, with a repetition of the occasion on the opening day of trial, when Mr. Schwartz as SEPTA's trial counsel argued that the judge should recuse himself because he was hostile to Mr. Schwartz. As has been discussed, we agree with counsel for Gerald that SEPTA has indeed waived this argument, although we have also found the argument without merit. The next time was in SEPTA's post-trial motion. In its motion SEPTA argued, as it has to us on appeal, that the trial judge should have recused himself because Mr. Daniels had represented him in a prior class action. Whether this argument has been waived is of no importance, for, as has also been discussed, it is without merit. SEPTA argued for the first time in its brief in support of its post-trial motion the issue of Mr. Mongeluzzi's affiliation with the Daniels firm and the issue of the relationship between the trial judge and Mr. Haaz, except that with respect to Mr. Haaz, SEPTA has made allegations on appeal that it did not make in its post-trial brief. Specifically, in its post-trial brief SEPTA argued that as a former law clerk of the trial judge, Mr. Haaz should not have acted as a lawyer in this case. It did not make its other arguments regarding Mr. Haaz—*i.e.*, that he was related by affinity to the trial judge; that he concurrently represented the judge in anoth-

er case; and that the judge has represented Mr. Haaz's mother—until after filing its appeal to this court.

The issue before us, therefore, is not whether SEPTA has waived *all* its arguments for recusal but, rather, whether it has waived its arguments regarding Mr. Mongeluzzi and Mr. Haaz. Counsel for Gerald argues that because SEPTA did not raise these arguments pre-trial, it has waived them; in counsel's view, a party waives all arguments for recusal not raised pre-trial unless the party proves that in the exercise of "due diligence" it could not have raised the arguments pre-trial. In support of this argument, counsel draws an analogy to cases involving after-discovered evidence.

This analogy is fundamentally flawed, and we are not persuaded by it. The distinction between cases involving after-discovered evidence and cases involving recusal is apparent. The parties always have a duty to discover evidence necessary to prove their contentions, whether to assert or defend against a claim, and they have pre-trial discovery procedures available to enable them to obtain such evidence. However, the parties have no duty to suspect or doubt or inquire regarding the impartiality of the judge. Absent actual knowledge of facts indicating that the judge's "impartiality might reasonably be questioned," Canon 3 C(1), the parties are entitled to assume that the judge *is* impartial, and that the judge does not know any facts, and that facts do not exist, such that the judge's impartiality might reasonably be questioned. If we were to accept the argument made by counsel for Gerald, the result would be that the parties, before trial, in addition to gathering information for trial, would be forced to investigate the judge and his relationships in order to uncover any possible reason for objecting to his presiding. Quite apart from the objection that it is unclear what procedures would be available to the parties with which to pursue and gather the relevant information, the result would be unacceptable, for it would transform the judge from a neutral presiding

officer into an adversary, or at least potential adversary, of the parties.

Ordinarily a party appearing before a judge, a hearing officer, an administratove board or an advisory panel is not responsible for conducting what in effect would be a *voir dire* into the integrity and fairness of such person or persons. In the absence of any indication to the contrary, a litigant is entitled to assume that a duly constituted judicial or administrative forum of justice passing upon his cause is wholly free, disinterested, impartial and independent.

*DeCamp v. Good Samaritan Hospital,* 66 A.D.2d at 767, 410 N.Y.S.2d at 672–73.

Recognizing that a rule requiring the parties to exercise due diligence in uncovering grounds for recusal would be unacceptable, the federal courts and many state courts have held that the Judicial Code's standards for recusal are self-executing and must be observed by a judge *sua sponte. See e.g., McCuin v. Texas Power & Light Co.,* 714 F.2d 1255 (5th Cir.1983) (§ 455 is self-executing; is judge's duty to disqualify himself as soon as he is aware that grounds exist); *Roberts v. Bailar,* 625 F.2d 125 (6th Cir.1980) (§ 455 is self-executing and must be observed by the judge *sua sponte* ); *SCA Services, Inc. v. Morgan, supra* (§ 455 is self-executing—no burden on parties to seek disqualification); *United States v. Boffa,* 513 F.Supp. 505 (D.Del.1981) (§ 455 is self-enforcing on part of judge); *Adams v. State,* 269 Ark. 548, 601 S.W.2d 881 (1980) (Judicial Code requires judge to note disqualification without any request by an attorney—appellate court raises *sua sponte* on appeal from denial of habeas corpus petition arraigning judge's failure to recuse himself); *Aetna Life & Casualty Co. v. Thorn,* 319 So.2d 82 (Fla.App.1975) (under Judicial Code judge has burden to determine his qualification to sit on case); *In re Complaint against Robert K. Broome,* 245 Ga. 227, 264 S.E.2d 656 (1980) (under Canon 3 C judge has affirmative duty to disclose even without challenge by party); *DeCamp v. Good Samaritan Hospital, supra* (person acting in judi-

cial or quasi-judicial capacity has duty to disclose associations with party or his agent that might cast doubt on his impartiality).

The duty of *sua sponte* recusal has been long recognized in Pennsylvania in the context of arbitration. The cases explicating this duty are most pertinent to our decision in this case, for parties before a judge are entitled to no less protection than parties before an arbitrator. In *Connor v. Simpson*, 4 Sadler (Pa.) 105, 7 A. 161 (1886), a party sought to set aside an arbitration award, alleging that the arbitrator and a party were partners under the contracts in question and that this information was not discovered until after the award was made. It was held that if these allegations were proved, the award must be set aside:

> This seems a proper case for trial. If Culver and Simpson were partners in the work let under the contracts, and concealed that fact from the defendant until after the hearing, the award cannot stand. It was competent for Culver, though a silent partner in the transaction, of one of the parties, to act as arbiter, provided the other party so agreed with full knowledge of the fact. Good faith required both Culver and Simpson, before any hearing, to inform the defendant of that fact, if it existed.
>
> *Id.*, 4 Pa. at 106, 7 A. 161.

*See also Abramovich v. Pennsylvania Liquor Control Board*, 490 Pa. 290, 416 A.2d 474 (1980) (arbitration award in Liquor Control Board statutory proceeding vacated where arbitrator acted as counsel to Board during pendency of proceedings; objection held preserved because arbitrator made no disclosure before hearing and objection was raised promptly upon learning of the relationship); *James D. Morrisey, Inc. v. Gross Construction Co., Inc.*, 297 Pa.Super. 151, 443 A.2d 344 (1982) (common law arbitration award vacated where one arbitrator's continuing business relationship with one party not disclosed to other party prior to entry of award). In *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), the United States Supreme

Court vacated an arbitration award because one arbitrator had a continuing business relationship with one of the parties and had even rendered services to the party on one of the projects involved in the arbitration. The opinion for the Court stated:

> But neither this arbitrator nor [the party] gave to petitioner even an intimation of the close financial relations that had existed between them for a period of years. We have no doubt that if a litigant could show that a foreman of a jury or a judge in a court of justice had, unknown to the litigant, any such relationship, the judgment would be subject to challenge.

393 U.S. at 151, 89 S.Ct. at 340.

Justice WHITE, in a separate opinion joined by Justice MARSHALL, emphasized that

> [i]f arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating an award.

393 U.S. at 152, 86 S.Ct. at 341.

 Having thus examined the cases, we have concluded that the waiver argument pressed upon us by counsel for Gerald is without merit. No party has any burden— either a burden of exercising "due diligence" or otherwise— to search out and discover whether perhaps there may exist some fact, known to the judge but unknown to the party, that requires recusal. Rather, if a ground for recusal exists, it is the burden of the judge, either to recuse himself *sua sponte*, or to disclose the ground and then preside only if no party objects to his presiding. If, after the judge's disclosure, a party does not object to the judge presiding, the objection will be held waived. But if the judge makes no disclosure, the failure to object will not result in waiver. In that event the party's obligation is to object following the party's own receipt in any way of actual knowledge of the facts that should have been disclosed. Objection must be made at the earliest opportunity. If the party receives actual knowledge before filing its post-trial motions, the

party must raise the ground on which it claims recusal was required by post-trial motion; if the party receives actual knowledge after filing its post-trial motions but before a ruling thereon, the party must raise the ground by supplemental motion or in its brief in support of the post-trial motion; but if the party does not receive such knowledge until after the trial court has ruled on post-trial motions, it may raise the ground on appeal. If the party fails to object at the earliest opportunity following receipt of actual knowledge, the objection will be held waived.[5] A party may not

5. The Code of Judicial Conduct as adopted by the American Bar Association, August 16, 1972, contains a subsection D to Canon 3, which provides as follows:

**D. REMITTAL OF DISQUALIFICATION.**

A judge disqualified by the terms of Canon 3 C(1)(c) or Canon 3 C(1)(d) may, instead of withdrawing from the proceeding, disclose on the record the basis of his disqualification. If, based on such disclosure, the parties and lawyers, independently of the judge's participation, all agree in writing that the judge's relationship is immaterial or that his financial interest is insubstantial, the judge is no longer disqualified, and may participate in the proceeding. The agreement, signed by all parties and lawyers, shall be incorporated in the record of the proceeding.

*Commentary:* This procedure is designed to minimize the chance that a party or lawyer will feel coerced into an agreement. When a party is not immediately available, the judge without violating this section may proceed on the written assurance of the lawyer that his party's consent will be subsequently filed.

The Code as adopted in Pennsylvania omits this provision. We interpret this omission as an indication that the Supreme Court rejected the view that a particular procedure must be followed before waiver may be found. We note in this regard that the procedure provided in Canon 3 D provides only for waiver under Canon 3 C(1)(c) and 3 C(1)(d), leaving it unclear whether the remaining grounds for recusal may be waived, and if they may be, what procedure is required to waive them. The federal statute expressly provides that grounds for recusal under § 455(b) may not be waived, although grounds under § 455(a) may be waived after full disclosure on the record. *See SCA Services, Inc. v. Morgan, supra* (rejects timeliness argument under § 455); *Muench v. Israel,* 524 F.Supp. 1115 (E.D. Wisc.1981) (although motion was untimely, court addresses issue anyway because there is authority that § 455(b) is mandatory and can not be circumvented by a claim of untimeliness). *But see In re International Business Machines,* 618 F.2d 923 (2d Cir.1980) (even though § 455 has no explicit time requirement, motion must be timely filed). We see no basis for distinguishing between the enumerated grounds for recusal in determining whether they may be waived. The appearance of impartiality is adequately protected by a determination

elect to take a chance on gaining a favorable decision and then, if the decision is unfavorable, raise grounds for recusal of which he or his counsel had actual knowledge prior to the decision being made. *See Delesdernier v. Porterie*, 666 F.2d 116 (5th Cir.) *cert. denied*, 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982) (motion untimely when judge made disclosure of relationship pre-trial and recusal motion was made for first time on appeal after two full trials); *Potashnick v. Port City Construction Co., supra* (ground for recusal raised for first time on appeal not waived because it was not discovered until after trial); *United States v. Conforte*, 624 F.2d 869 (9th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980) (can not raise grounds for recusal for first time on appeal when had notice of facts earlier—timeliness can not be disregarded in all cases, although it may be in extraordinary cases); *Smith v. Danyo*, 585 F.2d 83 (3d Cir.1978) (timeliness is significant because can not tolerate litigant knowing information and holding back hoping for favorable rulings and then seeking recusal when rulings are not favorable; recusal motion filed three months after events giving rise to objection but before trial and when there had been no rulings in meantime is timely); *United States v. Boffa, supra* (motion untimely when filed after party participated in substantial pre-trial motions despite knowledge of facts); *United States v. Kelly*, 519 F.Supp. 1029 (D.Mass.1981) (motion untimely where attorney had knowledge of facts but waited until after six week trial, mistrial and Rule 29(c) motion to file recusal motion); *Commonwealth v. Pavkovich*, 444 Pa. 530, 283 A.2d 295 (1971) (was error for judge who had been prosecuting attorney to sit on court en banc in deciding post-trial motions, but no objection was raised prior to appeal); *Commonwealth v. Musto*, 348 Pa. 300, 35 A.2d 307 (1944) (defendant waived objection when he proceeded to trial without objection, despite knowledge that judge may have been a witness); *Commonwealth v. Bahl*, 111 Pa.Super. 598, 170 A. 346 (1934) (motion untimely when judge

by the parties that despite knowledge of grounds for recusal, they have no objection to the judge presiding.

made disclosure before plaintiff completed his case and motion was made at end of defendant's case).

In arriving at these conclusions as to when waiver will and will not occur, we have not overlooked *Commonwealth v. Stanton*, 294 Pa.Super. 516, 440 A.2d 585 (1982), on which counsel for Gerald relies. In that case the appellant argued for the first time on appeal that the PCHA hearing judge should have recused himself because the appellant had filed a civil suit against the Lackawanna County Prison Board at a time when the judge was a member of the Prison Board. This court refused to consider the argument, stating that since it had not been raised prior to appeal, there was no competent evidence of record by which to evaluate the argument. While the opinion in *Stanton* contains some general language, it is not inconsistent with our holding here, for nothing suggests that the appellant in *Stanton* did not have actual knowledge of the facts underlying his recusal argument prior to appeal.

■ Here there is no question that the trial judge did not disclose pre-trial his relationship either with Mr. Mongeluzzi or Mr. Haaz. SEPTA's obligation, therefore, was to raise these relationships as grounds for recusal promptly following its receipt of actual knowledge of the relationships. As has been indicated, SEPTA alleges that it has fulfilled this obligation. However, its allegations are not binding on Gerald. Accordingly, at the hearing on remand, evidence may be presented on the issue of when SEPTA received actual knowledge regarding Mr. Mongeluzzi and Mr. Haaz, so that the hearing judge may, by application of what we have said here, determine whether any waiver did occur.

(ii)

■ Counsel for Gerald argues that to allow newly discovered grounds for recusal to be raised post-trial—as we have just held may in certain circumstances be done—is to penalize a party for the judge's failure to make disclosure. Counsel argues that Gerald has been severely injured and has been awarded much-needed damages, and that he

should not be penalized because the trial judge failed to disclose grounds for recusal. This argument seems to us to come with very poor grace, for it would seem that counsel must have known of the relationships between the trial judge and Mr. Mongeluzzi and Mr. Haaz. If, after hearing on remand, it is determined that because of these relationships the judge should have recused himself, and that therefore a new trial is necessary, counsel will have no one but himself to blame. For while it is true that the burden of disclosure rests with the trial judge, if a party or his counsel knows of possible grounds for recusal and wishes to ensure that a judgment will not be overturned, there is no reason why disclosure cannot be made by that party. A party may not complain when newly discovered grounds for recusal that he or his counsel knew about but chose not to disclose are later raised. As between the parties, the party without prior knowledge is certainly less at fault for such added expense, inconvenience, and delay as may result. *See Miller Industries, Inc. v. Caterpillar Tractor Co., supra* (problem could have been avoided by disclosure by party with knowledge; lateness of objection not fault of party who had no prior knowledge).

### (iii)

Counsel for Gerald argues that a waiver rule requiring actual knowledge of grounds for recusal will open final judgments up to collateral attack, *i.e.*, after the time for appeal has expired with no appeal having been taken, or after an appeal has been taken and the judgment has been affirmed. That, however, is not the situation before us, and we therefore need not decide in what circumstances a judgment no longer subject to challenge on appeal might be set aside because the trial judge should have recused himself but did not. For cases involving such situations, *see Margoles v. Johns*, 660 F.2d 291 (7th Cir.1981), *cert. denied*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982) (to be subject to collateral attack, petitioner must show that judge was in fact so biased that proceeding was unfair); *United*

*States v. Brown,* 539 F.2d 467 (5th Cir.1976) (final judgment of sentence vacated and new trial ordered despite fact that no actual prejudice was apparent on the record); *Adams v. State, supra* (state appeals court raises *sua sponte* on appeal from denial of habeas corpus petition ground for recusal of arraigning judge and orders that appellant be rearraigned before different judge); *Aetna Life & Casualty Co. v. Thorn, supra* (final judgment will be set aside where no substantial injustice will result from the delay and motion was made as soon as facts were discovered). So far as this case is concerned, we regard the fact that a judgment has been entered as of no importance. We recognize that expense, inconvenience, and delay will result, should it be determined that the trial judge should have recused himself and that a new trial is therefore required. But these consequences are as nothing when compared with the importance of ensuring, to the best of our ability, not only that the judicial system is fair, but that it is seen to be fair. As stated by another court:

> Notwithstanding the fact that the trial judge acted in the utmost good faith, we are unwilling to establish a precedent of permitting a disqualified judge to preside, who makes no disclosure of his disqualification. Of course, as has been said, the disqualification may be waived, but it is not waived by one who proceeds to trial in ignorance of the fact.

> It may be unfortunate that the case will have to be retried, but we think it better that a single case should be retried than to approve an improper precedent for the trial of future cases.

*Byler v. State,* 210 Ark. 790, 795, 197 S.W.2d 748, 751 (1946).

### (iv)

■■■ Counsel for Gerald argues that any error by the trial judge in failing to recuse himself or make disclosure

was harmless because the judge was not the trier-of-fact. This argument is without merit.

In the first place, the premise of the argument is that recusal is required only if prejudice to a party would result from no recusal. But this premise is mistaken. Canon 3 C of the Judicial Code applies to every judge in every case; it does not set a lower standard for a judge sitting without a jury than for a judge sitting with a jury, but a single standard. And as discussed above, that standard is an objective one: Are the circumstances such that the judge's "impartiality might reasonably be questioned?" Accordingly, a party arguing for recusal need not prove that the judge's rulings actually prejudiced him; it is enough to prove that the reasonable observer might question the judge's impartiality. *See supra* Part 2(a)(iii).

In addition, the argument implies that where the judge is not the trier-of-fact, his role is somehow less than decisive to the outcome of the proceeding. It is true that in some recusal cases the fact that the judge was not the trier-of-fact may be relevant in determining whether the judge abused his discretion in refusing to recuse himself, but those cases are not helpful here. Generally they involve a situation in which the judge was exposed to prejudicial, inadmissible evidence, which, if the judge had been the trier-of-fact, could arguably have tainted the fact-finding process. *See, e.g., Commonwealth v. Gonce,* 320 Pa.Super. 19, 466 A.2d 1039 (1983) (in related trial in which appellant was acquitted by jury, judge had expressed his disagreement with jury verdict); *Commonwealth v. Edney,* 318 Pa.Super. 362, 464 A.2d 1386 (1983) (judge presided after having presided over trial of defendant two weeks earlier on unrelated charges); *Commonwealth v. Baker,* 299 Pa. Super. 241, 445 A.2d 544 (1982) (judge presided at suppression hearing); *Commonwealth v. Johnson,* 291 Pa.Super. 566, 436 A.2d 645 (1981) (judge presided at suppression hearing); *Commonwealth v. Strunge,* 287 Pa.Super. 212, 429 A.2d 1176 (1981) (judge presided at bail hearing); *Commonwealth v. West,* 270 Pa.Super. 301, 411 A.2d 537 (1979)

(judge accepted nolo contendere pleas); *Commonwealth v. Pettiford*, 265 Pa.Super. 466, 402 A.2d 532 (1979) (judge presided at suppression hearing); *Commonwealth v. Conrad*, 241 Pa.Super. 324, 361 A.2d 421 (1976) (father of Commonwealth's chief witness spoke to judge *ex parte* regarding that witness). This case is not such a case. SEPTA does not challenge the integrity of the fact-finding process itself. Rather, it has raised several claims of error with respect to the trial judge's conduct of the *voir dire* and charge to the jury. These claims will be discussed below. At this stage the point to note is that with respect to both *voir dire* and charge, the trial judge has broad discretion. "It is ... well settled that the scope of a *voir dire* examination rests in the sound discretion of the trial judge and his decisions, even in a challenge for cause, will not be reversed in the absence of palpable error." *Commonwealth v. McGrew*, 375 Pa. 518, 526, 100 A.2d 467, 471 (1953) (citations omitted). "A trial court has broad discretion in phrasing its points for charge," *Commonwealth v. Ohle*, 503 Pa. 566, 470 A.2d 61, 70 (1983), and "in evaluating the correctness of instructions to a trial jury, the charge must be read and considered as a whole, and it is the general effect of the charge that controls," *Commonwealth v. Rodgers*, 459 Pa. 129, 132, 327 A.2d 118, 120 (1974). The Judicial Code's requirement that all judges—with or without a jury—must abide by the same standard recognizes this broad discretion. For given such discretion, the fact that the judge was not the trier-of-fact is not by itself sufficient to ensure the appearance of impartiality. *See Middle States Coal Co., Inc. v. Hicks*, 608 S.W.2d 56 (Ky.App.1980) (new trial ordered following *jury* trial because, *inter alia*, one of appellees' intended co-counsels was married to judge's sister).

One further, much less important but still not unimportant, consideration underlying the Judicial Code is a recognition of the fact that whether the proceedings in the trial court did or did not appear impartial is not something that the appellate court can always determine from a cold record.

The record does not reflect the tone of voice of the judge, his facial expressions, or his unspoken attitudes and mannerisms, all of which, as well as his statements and rulings of record, might have adversely influenced the jury and affected its verdict.

*United States v. Brown*, 539 F.2d at 469.

In invoking the doctrine of harmless error, counsel for Gerald has cited *Commonwealth v. Darush*, 501 Pa. 15, 459 A.2d 727 (1983). While there, in rejecting the appellant's demand for a new trial, the Court did refer to the facts that no prejudice appeared on the record and that the appellant was tried by a jury, the Court also emphasized that the allegations of bias were vague, unsubstantiated hearsay.[6] Certainly, if on remand SEPTA is unable to prove by competent evidence the existence of any ground for recusal, it should be denied relief. Also, in *Darush* the appellant did not challenge the trial judge's exercise of discretion, as SEPTA has done here in challenging the trial judge's conduct of the *voir dire* and his charge to the jury. Indeed, when carefully read, *Darush* illustrates how the fact that a trial judge has broad discretion may by itself require recusal. Even though the Court was "convinced the trial court acted with complete integrity in assuring appellant it harbored no prejudice against him," 501 Pa. at 24, 459 A.2d at 732, it nevertheless vacated the judgment of sentence and remanded for resentencing before a different trial judge, explaining that

considering all the circumstances, especially the trial court's inability to affirmatively admit or deny making remarks from which a significant minority of the lay community could reasonably question the court's impartiality, we feel the largely unfettered sentencing discre-

---

**6.** *See also Ransom v. S & S Food Center, Inc. of Florida,* 700 F.2d 670 (11th Cir.1983). (Judge Hand recused himself after entering summary judgment as to liability; Judge Thomas took over case, reviewed record and adopted rulings of Judge Hand; appellate court rejects argument that all rulings made before the recusal arc void and must be reheard by new judge).

tion afforded a judge is better exercised by one without a hint of animosity toward appellant.

*Id.*

Thus the Court again emphasized—what we have already discussed at length—that in deciding whether a judge should preside, the standard that must be applied is not subjective (the Court accepted the trial judge's own appraisal of his feelings), and has nothing to do with actual prejudice (the Court was entirely satisfied that in fact the judge's sentence would be fair); the standard is objective, and it is rigorous: "[C]ould a significant minority of the lay community ... reasonably question the court's impartiality?"

The short of the matter is that the doctrine of harmless error has nothing to do with this case. By invoking the doctrine, counsel asks us to assume that no matter what might be proved on remand, it could not make any difference, that is, it could not show that the trial judge should have recused himself and that a new trial was required. This assertion cannot withstand examination. As has been discussed, the record is incomplete regarding Mr. Mongeluzzi's interest in the Daniels firm and Mr. Haaz's relationship to the trial judge. We cannot know, and therefore we cannot assume, what will appear regarding these matters when on remand the record is made complete.

(v)

■■■ Following oral argument of this appeal, the trial judge filed a Supplemental Opinion. In the Introduction the judge states, among other matters, that "[t]he plaintiff is in need of a prompt decision, if he is to continue to receive his custodial care," and that "[i]n order to avoid unmerited delay[ ] and perhaps to obviate any need for remand, this Supplemental Opinion[ ] is filed." Slip op. at 2–3, (footnotes omitted). In the course of his opinion, the judge states "[t]he true and correct facts" regarding his relationship with Mr. Haaz, *id.* at 6 *et seq.*, and also discusses his representation of Mr. Haaz's mother, *id.* at 29, and various other aspects of the case, in explanation of his decision not

to recuse himself. The two judges who sat with the trial judge *en banc,* the Honorable Alfred J. DI BONA, JR. and the Honorable Thomas A. WHITE, did not join in the trial judge's Supplemental Opinion.

We may not take any account of the trial judge's Supplemental Opinion, for it is not part of the record, *Commonwealth v. Darush, supra; Independence Party Nomination,* 208 Pa. 108, 57 A. 344 (1904), and "we are bound by the record, and not by the statements of a judge appearing in his opinion," *Commonwealth v. Schwartz,* 267 Pa.Super. 170, 173, 406 A.2d 573, 574 (1979). If a judge in his opinion makes statements that "provide significant insight into a subject uniquely within the trial court's knowledge," *Commonwealth v. Darush,* 501 Pa. at 23 n. 8, 459 A.2d at 733 n. 8, then the statements may be considered, *id.,* but completion of the record on the matters here at issue—Mr. Mongeluzzi's interest in the Daniels firm and Mr. Haaz's relationship to the trial judge—will require proof of facts not uniquely within the trial judge's knowledge. The judge may not by his Supplemental Opinion foreclose the parties from developing those facts. As regards the judge's expressed concern about "unmerited delay": Whatever delay is caused by remand might have been avoided had disclosure been made before trial. As Justice WHITE said of arbitrators, *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. at 152, 86 S.Ct. at 341 (concurring opinion), so of judges: They should "err on the side of disclosure." Then the parties may make an informed decision on how they should proceed, and the appellate court an informed decision on whether recusal was required.

(vi)

Finally, we note that SEPTA does not seek a remand, except as an alternative form of relief; in its view, the record is sufficient for us to decide without remand that the trial judge should have recused himself, and that because he did not, a new trial is necessary. SEPTA acknowledges that the record is not complete, but urges that we supplement it by considering various statements in the trial

court's *en banc* opinion, and also, that we take judicial notice of various public records. However, the trial court's *en banc* opinion is no more part of the record than is the trial judge's Supplemental Opinion, *see* discussion *supra.* In any event, fairness to all parties requires that the facts be fully developed, and that can be done only on remand.

(c)

We think we should now consider the arguments made by Judge JOHNSON in his dissenting opinion. For the issue he raises—the extent to which an appellate court is restricted by the record—is fundamental.

Certainly as a general principle an appellate court is restricted by the record—that is, its decision must be supported by facts that appear of record. But the premise of this principle is that counsel seeking the court's decision was *able* to make the facts of record. Suppose, for example, that counsel seeks a new trial on the ground that the trial already conducted was unfair because of pre-trial publicity. The appellate court will look to the record to see whether the facts regarding the pre-trial publicity appear there. If they do not, the court will not order a new trial. For counsel could, and therefore should, have made the facts of record when he was before the trial court—copies of the newspaper stories; figures on the newspapers' circulation; and so on. *See Commonwealth v. Laurenson,* 323 Pa.Super. 46, 60–61, 470 A.2d 122, 129 (1983). Or suppose that counsel seeks a new trial on the ground that the trial court should have permitted a certain witness to testify. The appellate court will look to the record to see whether it contains an offer of proof stating what the witness would have said if permitted to testify. *See Spitzer v. Philadelphia Transportation Co.,* 348 Pa. 548, 36 A.2d 503 (1944); *Padden v. United Ass'n. of Plumbers,* 168 Pa.Super. 611, 82 A.2d 327 (1951).

The principle that in general an appellate court will restrict itself to the record is closely related to the principle of waiver, relied on by counsel for Gerald, which is why we have said that Judge JOHNSON's arguments overlap the

arguments made by counsel for Gerald. In waiver cases the appellate court will say that counsel has waived the relief he seeks because, by failing to call the issue in question to the attention of the trial court, he denied the court the opportunity to correct what he now says was error. *See Commonwealth v. National Federation of the Blind,* 471 Pa. 529, 370 A.2d 732 (1977); *Cherry v. Willer,* 317 Pa.Super. 58, 463 A.2d 1082 (1983). Similarly, the appellate court will not reverse the trial court where counsel failed to make of record facts showing that pre-trial publicity precluded a fair trial, or that a certain witness's testimony was important.

But the situation is different where counsel was *unable* to make a record. Then the appellate court's inquiry will be whether justice requires that the record be expanded—in other words, whether the case should be remanded so that counsel may offer in evidence the testimony that he was unable to offer when he was before the trial court. It is important to note that by remanding, the appellate court expresses no opinion on the ultimate outcome of the case. Since the pertinent facts do not appear of record, the court cannot know what that outcome should be. Thus, to remand for expansion of the record is not, as Judge JOHNSON suggests, inconsistent but rather in harmony with the general principle that an appellate court will restrict itself to the record.

Perhaps the most familiar instance in which the appellate court will find that justice requires remand for expansion of the record occurs in criminal cases. For example, appellate counsel may argue that a new trial should be granted because trial counsel did not offer alibi evidence. The appellate court does not respond: "We will not grant a new trial. We are restricted to the record, and you did not make a record of alibi." Instead, the court will recognize that since appellate counsel was not trial counsel, he *couldn't* have made a record of alibi. And therefore the court will go on to inquire, not whether a new trial should be granted, for indeed the record does not justify such relief, but

whether justice requires that the case be remanded to give counsel a chance to expand the record. *See Commonwealth v. Jennings,* 489 Pa. 578, 414 A.2d 1042 (1980) (failure to attempt to produce alibi witness); *Commonwealth v. Wade,* 480 Pa. 160, 389 A.2d 560 (1978) (failure to produce named alibi witness); *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977) (failure to object to district attorney's comments); *Commonwealth v. Twiggs,* 460 Pa. 105, 331 A.2d 440 (1975) (failure to subpoena witness who had testified for defense in first trial).

Of course, this inquiry will not be an undisciplined one. The appellate court will not remand simply because counsel says there *might* be an alibi witness. Counsel's representation must have sufficient substance to persuade the appellate court that justice requires remand. The representation need not be in any particular form—it may be by affidavit but typically it is simply a statement in counsel's brief—but it must be in such detail that the court knows that counsel is not merely speculating. *See Commonwealth v. Pettus,* 492 Pa. 558, 424 A.2d 1332 (1981) (appellate counsel alleged ineffectiveness of trial counsel in failing to petition for hearing on whether appellant should be transferred to juvenile court; allegations insufficient to warrant remand because no facts alleged suggesting appellant would have been entitled to transfer); *Commonwealth v. Mayfield,* 318 Pa.Super. 450, 465 A.2d 40 (1983) (appellate counsel alleged ineffectiveness of trial counsel in failing to obtain continuance in order to obtain eyewitnesses; allegations insufficient to warrant remand because no allegation of who witnesses were or that they would have been helpful or would have provided material evidence).

The necessity of an appellate court having the power to remand for expansion of the record may be further understood if one considers what would be the consequences of denying the court the power to remand—as Judge JOHNSON would deny this court the power here. To return to our earlier examples: Suppose trial counsel fails to make a record of prejudicial pre-trial publicity, or fails to make an

offer of proof of what a given witness would say if permitted to testify. Now suppose further that appellate counsel, *going outside the record*, represents in his brief to the appellate court that a named alibi witness was available to testify at trial, that he would have testified that appellant was elsewhere at the time of the crime, and that appellant had informed trial counsel of these facts but that trial counsel had not attempted to produce the witness. For the appellate court, in the face of such representations, to refuse to remand might result in the gravest injustice. The accused had a constitutional right to effective assistance by trial counsel. If what appellate counsel represents is true, trial counsel may have been ineffective, and the accused denied his constitutional right. The only way the appellate court can resolve the matter—one way or the other, either that the accused was or was not denied his constitutional right—is to remand the case to permit appellate counsel to prove, if he can, that what he has represented in his brief to the appellate court is indeed true, and also, to permit trial counsel to explain why he acted as he did. *See Commonwealth v. Jennings, supra; Commonwealth v. Wade, supra; Commonwealth v. Twiggs, supra.* For the appellate court to refuse to remand, on the ground that it is "restricted by the facts of record," would be to say: "We know that the accused may have been denied his constitutional right, but we're helpless to do anything about it."

The situation that confronts us in this case is at least as compelling as the examples we have cited. For an appellate court has no responsibility more pressing than to ensure, to the extent of its limited abilities, that the stream of justice runs clean and clear. Appellate counsel has represented to us that the trial may have been conducted in violation of the Canons of the Code of Judicial Conduct. The representation is substantial: As appears from our foregoing discussion, the facts that Mr. Mongeluzzi has *some sort* of interest in the Daniels firm, and that the trial judge has *some sort* of relationship with Mr. Haaz, are all undisputed. (In this regard, we note in passing that appellate counsel has

made the representations not only in his brief but also in his motion to supplement the record, to which he has attached an affidavit. We do not understand Judge JOHNSON's reference to no "properly subscribed" affidavit. However, the point is unimportant since the facts *are* undisputed.) To be sure, as we have discussed, these undisputed facts are not dispositive. When *further* facts are known, it may appear, either that the trial judge should indeed have recused himself, or that recusal was not required. Our position *now* is that we only know enough to know that recusal *may* have been required, just as in other cases we only know enough to know that trial counsel *may* have been required to prove pre-trial publicity, or to make an offer of proof, or to call an alibi witness. And just as in such cases, the only way we can resolve the matter is to remand the case so that the record may be expanded—not only by counsel for SEPTA, but also by counsel for Gerald, and, if the trial judge wishes, by counsel for the trial judge.

For us to refuse to remand would, in our judgment, be both illogical and unfortunate. As we have mentioned, the premise of the general principle that an appellate court will restrict itself to the record is that counsel was able to make the record. It would be illogical for the court to restrict itself to the record where counsel was unable to make the record because he did not know that any facts existed that might require recusal. That would penalize counsel for not doing what he could not do. But beyond this consideration is the consideration that, so far as we know now, the reason counsel did not know that any facts existed that might require recusal is that the trial judge failed to disclose them. Thus, by refusing to remand we might be shielding a judge from a failure to do what he should have done. We should, in short, be saying: "We know that the trial may have been conducted in violation of the Canons of Judicial Conduct, but we're helpless to do anything about it."

(d)

It remains to consider how the hearing on remand shall be conducted. We have already discussed the issues

that should be inquired into, and the legal principles that should be applied, by the hearing judge. We now add that the hearing judge should be a judge other than the trial judge or the other members of the trial court *en banc*. Both the trial judge and the court *en banc* have already decided that recusal was not required; they could not, therefore, examine that issue without any preconceptions. Moreover, it is possible that the trial judge may be asked, or may wish, to testify at the hearing on remand.

-3-

SEPTA argues that the trial judge erred in refusing to ask certain *voir dire* questions "intended to elicit particularized bias against SEPTA, and to lay the groundwork for even more precise questions in` the event of doubts or hesitation by prospective jurors." Brief for Appellant at 24. SEPTA also argues that the trial judge erred in charging the jury with respect to SEPTA's duty of care as a common carrier and Gerald's duty of care.

We decline to review these allegations of error prior to a determination on the recusal issue. On that issue, a new trial either will, or will not, be ordered. If a new trial *is* ordered, then we need not reach the allegations of error. If a new trial is *not* ordered, because it is determined after remand that there was no appearance of impropriety requiring recusal, it will then be appropriate for us to review the allegations of error. We have articulated the standards of review *supra*, at 454–458. As there discussed, the question, generally stated, will be whether the trial judge abused his discretion. When an appellate court asks this question, it assumes that there was no appearance of impropriety, *i.e.*, that it was proper for the judge exercising the discretion in question to be presiding. We will not know whether it was proper until after completion of the hearing on remand.

-4-

Finally, SEPTA makes several arguments with respect to the issue of damages. Specifically, it argues that the trial

court erred: (a) in allowing recovery for costs attributable to the Woods School; (b) in holding admissible evidence of medical expenses recoverable under the No-Fault Act; and (c) in awarding delay damages under Pa.R.C.P. 238. The issues raised by these arguments are purely legal issues; their resolution involved no exercise of judicial discretion by the trial judge, and therefore on review we are not required to consider whether the trial judge abused his discretion. Accordingly, it is appropriate that we decide these issues now, without awaiting a determination on the recusal issue. Moreover, if, on the recusal issue, a new trial is ordered, our decision should prove helpful because these issues will in all probability arise again at the new trial.

(a)

█ SEPTA argues that there should have been no award of damages attributable to the costs of the Woods School because these amounts are recoverable from the no-fault carrier as "medical and vocational rehabilitation services." [7] The No-Fault Act, 40 P.S. § 1009.103, defines "medical and vocational rehabilitation services" as follows:

7. SEPTA also argues that to the extent that the Woods School costs are not attributable to rehabilitation, they are attributable to "custodial" costs, *i.e.* room and board, and that since Gerald also recovered his lost earnings, which would normally be used to pay for the ordinary costs of living (including room and board), he has been permitted a double recovery in this regard, and that therefore the trial judge erred in not charging the jury that "these regular costs of living ... were not recoverable." We find no error in this regard.

In support of its argument, SEPTA relies on survival action cases, in which the jury is instructed to deduct the cost of maintenance from the victim's lost earnings. *See, e.g., McClinton v. White,* 497 Pa. 610, 444 A.2d 85 (1982). However, while recovery for the cost of institutional care, such as Gerald's, may relieve a victim of some maintenance costs, it does not relieve him of all maintenance costs, and SEPTA offered no evidence in this regard. Indeed, at page 45, n. 34 of its brief, it states, "It is difficult to estimate what portion of the Woods Schools [*sic*] services go toward rehabilitation as opposed to room and board, or any other separable service." In these circumstances, we agree with the trial court that the evidence submitted on behalf of Gerald proved " 'with some reasonable measure of accuracy' " the expenses that he would incur in securing custodial care. En Banc Opinion at 56. *See DiPietro v. Great Atlantic and Pacific Tea Co.,* 315 Pa. 209, 216, 173 A. 165, 168 (1934) (to recover for costs of institutional care, plaintiff had to prove "what was his life expectancy after his

"Medical and vocational rehabilitation services" means services necessary to reduce disability and to restore the physical, psychological, social, and vocational functioning of a victim. Such services may include, but are not limited to, medical care, diagnostic and evaluation procedures, physical and occupational therapy, other necessary therapies, speech pathology and audiology, optometric services, nursing care under the supervision of a registered nurse, medical social services, vocational rehabilitation and training services, occupational licenses and tools, and transportation where necessary to secure medical and vocational rehabilitation services. A basic loss obligor is not obligated to provide basic loss benefits for allowable expense for medical and vocational rehabilitation services unless the facility in which or through which such services are provided has been accredited by the Department of Health, the equivalent governmental agency responsible for health programs, or the accrediting designee of such department or agency of the state in which such services are provided, as being in accordance with applicable requirements and regulations.

In order to be recoverable from the no-fault carrier, therefore, services must be: (1) "necessary to reduce disability and to restore the physical, psychological, social, and vocational functioning of [the] victim"; and (2) must be rendered

injury, and with some reasonable measure of accuracy, the amount he would probably have to pay at the time of such periodic payments, because of his then present condition."). We have found no cases in Pennsylvania in which a deduction such as SEPTA contends for has been made in a case involving long term institutional care. *See Frankel v. United States,* 321 F.Supp. 1331 (E.D.Pa.1970) *aff'd,* 466 F.2d 1226 (3d Cir.1972) (no Pennsylvania authority to support government's proposition that recovery for subsistence portion of room and board should be denied unless shown to exceed the amount that ordinarily would have been expended for subsistence in absence of the injury). But even if such a deduction might properly be made, the trial judge did not err in refusing a jury instruction to this effect when appellant offered no evidence in support of the deduction; a jury may not be instructed to make a deduction in calculating damages when there is no evidence from which it can determine the proper amount of the deduction. The cost of institutional care having been proved with a reasonable degree of accuracy, it was SEPTA's burden to introduce evidence to support any deduction from that cost.

by a facility accredited by the Department of Health, the equivalent governmental agency, or the accrediting designee of the department or agency. SEPTA argued to the trial judge that the Woods School services are being provided to rehabilitate Gerald, and that the Woods School is accredited by an "equivalent governmental agency." On behalf of Gerald, it was argued that he has reached a "plateau", so that the Woods School services are being provided for custodial care and maintenance and not for rehabilitation, and also, that the Woods School is not accredited by the Department of Health or an equivalent governmental agency, in other words, that the costs of the Woods School services are not recoverable from the no-fault carrier and therefore are recoverable from SEPTA. The trial judge resolved this issue against SEPTA and instructed the jury that it could award as damages the costs of the Woods School services. In upholding this ruling, the court *en banc* states in its opinion at page 58 that "[a] review of hundreds of pages of testimony support[s] the finding that plaintiff's [Gerald's] devastating physical, mental, and psychological injuries are permanent and that his disability cannot be further reduced." The court further states, En Banc Opinion at 58, "that the Woods School is not a facility which 'has been accredited by the Department of Health.' It is not licensed as a medical or health care provider. Its purpose is to provide a residential environment along with care and maintenance to a small group of the most severely injured people in the United States who cannot, because of the extent of their injuries, care for themselves."

■ The issue of whether the Woods School is properly accredited under the requirements of 40 P.S. § 1009.103, is a legal issue, to be resolved by the trial judge. It was undisputed that the Woods School is not accredited by the Department of Health. *See, e.g.,* N.T. February 18, 1983, at 1332, 1385, 1426. The question therefore became whether it is "accredited by . . . the equivalent governmental agency responsible for health programs." 40 P.S. § 1009.103. There was undisputed evidence that the Woods School is

licensed by the Department of Public Welfare as a residential treatment center. N.T. February 18, 1983, at 1331, 1384. Although the court *en banc* held that the Woods School was not properly accredited under 40 P.S. § 1009.-103, it did not look beyond the fact that the Woods School is not accredited by the Department of Health. This was error. Once the court concluded that the Woods School is not accredited by the Department of Health, it was then required to determine whether accreditation by the Department of Public Welfare is sufficient under section 103 as accreditation by an "equivalent governmental agency responsible for health programs." We hold that it is. For when the statutory responsibilities of the Department of Health and Department of Public Welfare are compared, the conclusion is compelling that the Department of Public Welfare is an "equivalent governmental agency responsible for health programs."

The Department of Health and the Department of Public Welfare both have substantial authority and responsibility for "health programs." Under 35 P.S. § 448.807, the Department of Health has the authority to license health care facilities, defined to include a hospital, a skilled nursing facility, a home health care agency, an intermediate care facility, an ambulatory surgical facility and a birth center, 35 P.S. § 448.802a. Under 62 P.S. § 1003, the Department of Public Welfare has the authority to license "facilities," defined to include an adult day care center, a child day care center, a family day care home, a boarding home for children, a mental health establishment, a personal care home for adults, a nursing home, a hospital and a maternity home.

The Department of Public Welfare's authority to license facilities under 62 P.S. § 1003, has been limited by various Reorganization Plans adopted by the legislature. Reorganization Plan No. 2 of 1973, 71 P.S. § 755–2, transferred to the Department of Health the powers of the Department of Public Welfare with respect to "supervision and licensing of special and general hospitals." Reorganization Plan No. 5

of 1973, 71 P.S. § 755–5, transferred to the Department of Health the powers of the "Division of Health Facilities Planning and Construction in the Department of Public Welfare." Reorganization Plan No. 3 of 1975, 71 P.S. 756–3, transferred to the Department of Health the powers of the Secretary and Department of Public Welfare with respect to "licensing of skilled nursing homes, intermediate care nursing homes; and personal care homes, homes for the aged and infirm, and convalescent homes, but only insofar as the homes provide nursing care." Finally, Reorganization Plan No. 1 of 1980, 71 P.S. § 758–1, transferred to the Department of Health the powers of the Department of Public Welfare with respect to "licensing of maternity homes and hospitals insofar as the homes and hospitals provide medical or nursing services," while directing that the powers of the Department of Public Welfare with respect to "licensing of maternity homes and hospitals insofar as the homes and hospitals provide residential or social services are retained within the Department of Public Welfare."

Thus, the Department of Health has licensing authority primarily with respect to medical care facilities and other facilities insofar as they provide medical services, while the Department of Public Welfare has licensing authority primarily with respect to mental health establishments and other facilities insofar as they provide services related to social or psychological needs. The No-Fault Act, 40 P.S. § 1009.103, defines medical and vocational rehabilitation services as "services necessary to reduce disability and to restore the physical, *psychological, social,* and *vocational* functioning of a victim." (emphasis added). Since the No-Fault Act is designed to facilitate the victim's physical, psychological, social, and vocational rehabilitation, and since the Department of Health and the Department of Public Welfare share the responsibility for licensing facilities that provide these services, it follows, and we hold, that a facility licensed by the Department of Public Welfare is a properly accredited facility under 40 P.S. § 1009.103.

■■ Since the Woods School is properly accredited, the issue of whether the jury could award the costs of the school's services as damages depended upon whether those services were to reduce Gerald's disability and restore his functioning, in which case the costs could not be awarded because they were recoverable from the no-fault carrier, or were for Gerald's custodial care, in which case the costs could be awarded. Which the services were was a factual issue, disputed by the parties. After hearing testimony, the trial judge himself resolved this factual dispute, and instructed the jury that the costs could be awarded. N.T. February 24, 1983, at 2013. In explaining his ruling, the judge stated to counsel:

Gentlemen, I said at the completion of the case I would place upon the record my findings, or an indication of some of my findings with regard to the issue as to whether or not custodial care is medical expenses within the meaning of the act. The answer is rather obvious to all of you. I have considered all of the evidence, and I very, very much find that the expenses in this case are not medical expenses; they are institutional or custodial expenses. To the extent that there is some therapy involved in the institutional or custodial care, I think it is so minimal that it cannot be considered as a bar for, or a justification for preventing the plaintiff from recovery.

There would also be a complete barrier to such a position. Because as I recall the testimony, the witness said that all that remains for purposes of therapy is about six months, and I accepted that testimony. So at the end of the six months the plaintiff has gotten as far as he is ever going to get. That is his condition, it is never going to improve any for the rest of his life. So, therefore, I think he is entitled to recover that. That is my ruling. I will supplement it with further findings of fact. I remember the six-months thing. I hope you are all proud of me for remembering. I consider that as an impressive fact.

*Id.* at 2070–71.

This was error. It was for the jury to resolve the nature of the Woods School services, not the judge.[8] *Cf. Dragun v. Volk*, 500 Pa. 613, 459 A.2d 333 (1983) (trial court erred in entering summary judgment; court held without a record clearly showing their purpose that as a matter of law all physical therapy expenses are rehabilitation costs subject to $100 ceiling). *Krupa v. Williams*, 316 Pa.Super. 408, 463 A.2d 429 (1983) (question whether facial scarring constituted permanent, irreparable and severe injury sufficient to sustain a tort action is normally for jury, not court); *Coyle v. Staley*, 315 Pa.Super. 189, 461 A.2d 861 (1983) (trial court erred in granting summary judgment because was question of material fact as to whether physical therapy was for rehabilitation purposes); *Williams v. Dobransky*, 304 Pa. Super. 483, 450 A.2d 1015 (1982) (trial court erred in granting summary judgment because appellant had failed to establish that he had suffered medically determinable physical impairment preventing him from performing his customary duties for more than 60 days; in granting summary judgment trial court resolved disputed issues of fact, which were exclusively for fact-finder to determine). *Widziszewski v. Mashuda Corp.*, 288 Pa.Super. 191, 431 A.2d 353 (1981) (trial court erred in entering summary judgment on basis that plaintiffs had not met threshold requirement of showing that they had been incapacitated for period substantially in excess of 60 days; there was genuine issue of fact in this regard; defendants may make appropriate motions at conclusion of plaintiffs' case if plaintiffs unable to prove threshold requirements).

Nor can it be maintained that in resolving the nature of the Woods School services, the trial judge was not resolving a disputed factual issue. As the judge himself stated, see the quotation *supra*, there was evidence to support a finding that the Woods School costs would be attributable to

8. It will be recalled that in discussing the recusal issue, we rejected the argument that where the judge is not the trier-of-fact, the doctrine of harmless error may be invoked. We may now supplement this discussion by noting that in any event, here the judge *was* the trier-of-fact.

rehabilitation services for a period · of six months. Dr. Mayer testified that "[i]f after a reasonable clinical trial we see no improvement in the particular skill, then the therapy is discontinued." N.T. February 17, 1983, at 1226. He further testified that a reasonable clinical trial period would be six months. *Id.* at 1227. Therefore, if the trial judge had permitted the jury to resolve the issue, it certainly would have been reasonable for the jury to find that the Woods School services would be attributable to rehabilitation for some period of time and to custodial care thereafter.

Of course, the trial judge was required to make an *initial* determination regarding the nature of the Woods School services. The evidence regarding the cost of the services would be irrelevant if the costs were attributable to rehabilitation services, which would be recoverable from the no-fault carrier.[9] On the other hand, the evidence would be relevant if the costs were not attributable to rehabilitation services and therefore were not recoverable from the no-fault carrier. Therefore, the relevance of the evidence ultimately turned on the resolution of the factual issue of the nature of the damages—which issue was for the jury. In such a situation of conditional relevance, the judge should "merely require the proponent [Gerald] to bring forth evidence from which the jury could find it [the condition] to be true, after which the conditionally relevant fact will be admitted." McCormick on Evidence § 53 at 124–45 (2d ed. 1972). Upon the presentation of such evidence, "the adversary may bring disputing evidence, and the dispute will in the end be for the jury, not the judge, to resolve."

9. *See infra* Part 4(b). The court *en banc* states in its opinion, at page 65, that "Pennsylvania law allows the introduction of evidence of such expenses, in some contexts, even though they are not recoverable. . . . Even if Gerald Reilly were not entitled, as a matter of law, to his full custodial care expense, the jury would still have been allowed to consider those costs in reaching its verdict." (citation omitted). The error in this analysis is that the trial judge did not just admit this evidence for the jury's consideration. Rather, he specifically instructed the jury that the amounts attributable to Gerald's "custodial care" were recoverable as damages against SEPTA.

*Id.* (footnote omitted).[10] Here, however, as we have discussed, the trial judge did not instruct the jury to resolve the dispute regarding the Woods School costs, but instead resolved it himself by making a finding of fact that the costs were not attributable to rehabilitation services. *Cf. Ritson v. Don Allen Chevrolet,* 233 Pa.Super. 112, 336 A.2d 359 (1975) (trial judge erred in excluding expert's testimony; evidence of the condition of a physical object either prior or subsequent to the time in issue is admissible if accompanied by proof that it has not changed in meanwhile; once threshold showing is made that condition of object has remained same, evidence is admissible and weight of evidence is then matter for jury). Since the trial judge's error regarding the Woods School costs was not harmless, SEPTA is entitled to a new trial. However, the trial will be limited to the issue of damages. In saying this, we assume that a new trial generally is not awarded after determination of the recusal issue; in the event that such a new trial is awarded, then what we have said here regarding the Woods School costs may be of guidance to the judge at that trial.

(b)

■ SEPTA argues that the trial judge erred in admitting evidence of the costs of medical and rehabilitation vocational services that were admittedly recoverable from the no-fault carrier. In admitting this evidence, the judge

10. Although SEPTA did not offer any evidence to support its argument that the Woods School costs were for services attributable to rehabilitation, it did cross-examine Gerald's experts, and they were equivocal. *See, e.g.,* N.T. February 15, 1983, at 863 (Dr. King: "I think the reasonable expectation for Gerry would be more adaptive to better be able to deal with his disabilities, to utilize his present limitations and handicaps, to be more independent. I would not expect at all any improvement in the handicaps themselves."); *id.* at 864–65. (Dr. King: purpose of various therapies is to maximize Gerald's ability to function with handicaps he has); N.T. February 18, 1983, at 1299. (Dr. Keating: " 'Although dramatic improvement so long after the trauma is unlikely, incremental gains and functioning may be possible over time.' " The court *en banc's* statement at page 60 of its opinion, that "[t]he uncontradicted facts are that the plaintiff has no realistic expectation of decreasing his disability or increasing his level of functioning," is therefore erroneous, since Gerald's own experts did not rule out incremental gains in his functioning.

relied on this court's opinion in *Martin v. Soblotney,* 296 Pa.Super. 145, 442 A.2d 700 (1982), in which we held that evidence of such costs was admissible because it was relevant to the determination of damages for pain and suffering. After the trial court's *en banc* decision upholding the trial judge's ruling, our decision in *Martin* was reversed by the Supreme Court, 502 Pa. 418, 466 A.2d 1022 (1983). The Supreme Court held that evidence of medical expenses is irrelevant and therefore inadmissible to the determination of pain and suffering. The Court stated, however, 502 Pa. at 426 n. 7, 466 A.2d at 1027 n. 7, "This holding is, of course, intended to apply only to trial rulings made on or after the date of this Opinion." The trial judge's admission of this evidence prior to the Supreme Court's decision in *Martin,* therefore, was not error.

We have held, however, that SEPTA is entitled to a new trial on the issue of damages. Since that new trial will be controlled by the Supreme Court's decision in *Martin,* evidence of medical and rehabilitation expenses will not be admissible to establish pain and suffering.

(c)

■ Finally, SEPTA argues that it should not be held jointly and severally liable for that portion of damages awarded under Pa.R.C.P. 238 attributable to the delay of defendant Baker. SEPTA offers no authority for this proposition; its sole argument is: "Were Rule 238 interpreted in this manner, its effect would be to discourage rather than encourage settlement offers in joint tortfeasor cases under the Comparative Negligence Act." Brief for Appellant at 48. This argument is without merit.

Pa.R.C.P. 238 provides for the addition of delay damages to the verdict. These damages are calculated at 10% per annum from the later of the date that the complaint was filed or one year after the cause of action accrued, until the date of the verdict. If before trial a defendant makes a written offer of settlement with prompt cash payment to the plaintiff, and the offer continues in effect until the start

of trial but is not accepted and the plaintiff does not recover more than 125% of the offer, delay damages may not be awarded for the period after the date the offer was made. Pa.R.C.P. 238(e). The Comparative Negligence Act, 42 Pa. C.S. § 7102(b) provides:

**(b) Recovery against joint defendant; contribution.**—Where recovery is allowed against more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal negligence to the amount of causal negligence attributed to all defendants against whom recovery is allowed. The plaintiff may recover the full amount of the allowed recovery from any defendant against whom the plaintiff is not barred from recovery. Any defendant who is so compelled to pay more than his percentage share may seek contribution.

There is no question in this case that neither SEPTA nor Baker made an offer of settlement within the terms of Rule 238(e). Although SEPTA asserts it made an offer, it was an oral and not a written offer, as required by Rule 238(e). Under the clear language of the Rule and Comparative Negligence Act, the consequent delay damages were therefore recoverable from "any defendant." We fail to see how a defendant is discouraged from making an offer pursuant to the Rule because under the Act he will be responsible for the total amount of delay damages awarded, if neither he nor his co-defendant makes an adequate settlement offer.[11] It seems to us that this possibility could only encourage making an adequate settlement offer.

11. This is not a case in which one defendant has made an adequate settlement offer under the terms of the Rule and the other has not. We express no view on whether it would be consistent with the purposes of the Rule in that situation to hold the defendant who had made an adequate settlement offer responsible for the delay damages attributable to his codefendant. *See Lavin v. Mylecraine,* 307 Pa.Super. 564, 453 A.2d 1031 (1982) (*dictum* that if defendants who actually settled had made an offer that was rejected, they would have been exonerated from any more damages attributable to the period after the offer was made).

Case remanded for an evidentiary hearing before a different judge to determine whether Judge KREMER should have recused himself. Jurisdiction retained.

JOHNSON, J., filed a concurring and dissenting opinion.

JOHNSON, Judge, concurring and dissenting:

I join the majority's disposition of the sufficiency of evidence and damages issues, as well as their disposition of the recusal issue regarding the judge's personal bias, which was initially raised pre-trial. I respectfully dissent to the majority's disposition of the remaining recusal allegations raised by appellants.

Appellants argue that the trial judge was required to have recused himself in the instant case. In support of this argument, appellants allege four reasons in their brief to this court for recusal:

(1) the trial judge had a personal bias against counsel for appellant SEPTA, based on a previous, unrelated action;

(2) the trial judge was previously represented as a plaintiff in a class action suit by plaintiffs' counsel;

(3) the trial judge's son-in-law is associated with plaintiff counsel's law firm; and

(4) the trial judge's former law clerk is associated with plaintiff counsel's law firm.

Appellants argue that Canon 3 of the Code of Judicial Conduct required disqualification of the trial judge because, based on these allegations, the trial judge's impartiality might reasonably be questioned. The relevant portions of Canon 3 state:

**C. Disqualification**

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

.　　.　　.　　.　　.

(d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

.　　.　　.　　.　　.

(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

.　　.　　.　　.　　.

Only the allegation of personal bias against SEPTA's counsel has any foundation in the record as certified to this court. On this aspect of the recusal argument, I join the majority's holding that the issue was waived because of appellants' failure to file a *timely* written recusal motion, as specified by the trial court in its Case Management Order of June 28, 1982. I further agree that based on the record, the issue is without merit.

As to the remaining recusal issues, I must dissent.

The issue of the judge's representation by plaintiffs' counsel in the class action, *Kremer et al. v. Barbieri,* was first raised in appellants' post-trial motions. The associations of the judge's son-in-law and former law clerk with plaintiff counsel's law firm were not raised in post-trial motions, but only in appellants' brief in support thereof. The allegations that Mr. Haaz, the former law clerk, (1) is the judge's step-nephew, (2) acted as a lawyer in the instant case, (3) represented the trial judge in an unrelated case, as well as the allegation that (4) the trial judge previously represented Mr. Haaz and his mother in a former case, appear for the first time in appellants' *post-appeal* pleading entitled Application for Leave to File Supplemental Brief and for such other Relief as may be Required to Perfect the Record, filed October 11, 1983.

None of the allegations, other than personal bias, has any factual support made as part of the record. No evidentiary hearing was held on these other issues, nor any stipulation of fact or affidavit, properly subscribed, filed. We are asked to rule on these recusal issues based solely on the allegations set forth by appellants in their various briefs and post-appeal motions. The law is clear that an appellate court must decide a case based on facts of record and not on allegations of fact contained in appellate briefs. *Commonwealth v. Mazzochetti*, 299 Pa.Super. 447, 445 A.2d 1214 (1982); *Commonwealth v. Stanton*, 294 Pa.Super. 516, 440 A.2d 585 (1982) (recusal issue); *Dile v. Dile*, 284 Pa.Super. 459, 426 A.2d 137 (1981). The *record* contains *no* facts relating to the remaining recusal issues. Therefore, such issues should not be decided, nor even reviewed, by this court under circumstances where the facts are not of record.

I note that the trial court *en banc* addressed the merits of the recusal issue first raised in post-trial motions and those two issues raised initially in appellants' brief in support thereof. However, I am not persuaded that merely because these issues were addressed by the trial court in its opinion, that they are automatically subject to our review, as the opinion written by the trial court is not a part of the record. *Independence Party Nomination*, 208 Pa. 108, 57 A. 344 (1904); *Commonwealth v. Schwartz*, 267 Pa.Super. 170, 406 A.2d 573 (1979); *but see Commonwealth v. Darush*, 501 Pa. 15, 459 A.2d 727 (1983) (suggesting trial court statements in its opinion "... provide significant insight into a subject [impartiality of judge] uniquely within the trial court's knowledge ...").

The majority concedes this lack of record facts (at 439–444) but goes on to discuss the possible merits of these arguments and orders a remand for an evidentiary hearing before a different judge.

As I believe this court lacks the authority to permit even such limited relief, I dissent. To permit review of facts not of record and make *any* substantive determination based on

such review involves a dangerous use of this court's authority to review on appeal. By doing so, we invite parties to raise allegations not of record or not properly preserved. Granted, the majority's review of the allegations concludes with a determination that a remand is necessary as to several of the allegations, but even such a remand should be based on a review only of facts of record. I agree with the approach taken in *Commonwealth v. Stanton, supra,* where this court refused to consider appellant's argument that the PCHA hearing judge should have recused himself because the judge was defendant in a civil suit initiated by appellant. The court stated:

> The record made at the PCHA hearing indicates quite clearly that at no time did Appellant's counsel request that the hearing judge recuse himself. *Nor are any of the "facts" concerning Appellant's civil action contained in the record.* Such information, if it is that, appears for the first time in Appellant's appellate brief.

> The practice of setting forth facts in a party's brief but not of record has been specifically condemned and we may not, as a reviewing court, consider them.

294 Pa.Super. at 521–22, 440 A.2d at 587–88 (citations and footnote omitted) (emphasis added).

Hence, my dissent.

Appellants have also raised several other issues on this appeal: (1) the insufficiency of the evidence supporting liability on the part of defendants, (2) the excessiveness of the damages, (3) failure of the trial court to permit certain voir dire questions and (4) that the jury charge was prejudicial with respect to appellant SEPTA's standard of care, duties owed by SEPTA to the victim and the victim's own duty of care.

The majority holds the insufficiency issue to be without merit. I agree.

As to the damages issue, the majority finds one aspect to have merit and to require a new trial as to damages, namely the trial court's erroneous determination, as a matter of

law, that damages attributable to the costs of the Woods School are not recoverable from the no-fault carrier and are therefore recoverable at trial. I agree with the majority that the question of whether these costs constitute "medical and rehabilitation services" under 40 P.S. § 1009.103 is a question properly directed to the jury on the facts in the instant case. I also agree that Woods School's accreditation by the Department of Public Welfare constitutes accreditation by "... the equivalent governmental agency responsible for health programs". Finally, I agree that the remaining issues as to damages are without merit.

The majority postpones review of the voir dire and jury charge issues, pending the determination by the trial court on remand for an evidentiary hearing. As I do not believe a remand on the recusal issue is appropriate on this *direct* appeal, I would address those issues. My review of the record, as well as the briefs and trial court opinion, convinces me that these issues are without merit.

I would therefore affirm the verdict, but remand solely for a new trial limited to the issue of damages.